MERKEL v. CONSUMERS POWER CO.

1. EVIDENCE—MAPS—ADMISSIBILITY—IDENTIFICATION.
   A map made by a private surveyor may not be received in evidence until it is properly identified.

2. SAME—PRIVATE SURVEYOR.
   In an action against a power company for damages to plaintiff's land and crops, claimed to have been caused by defendant's unreasonable release from its dam of water for power purposes, a map of plaintiff's land prepared by a private surveyor for plaintiff was admissible in evidence after it had been properly identified by the surveyor.

3. SAME—MAPS, CORRECTNESS—ADMISSIBILITY.
   An objection that the map was inadmissible because it delineates the original channel of the stream is without merit, where it appears that the channel is not of importance in the case, and it is not shown that the surveyor did not correctly delineate it.

4. WITNESSES—QUALIFICATION—RENTAL VALUE OF LAND.
   A witness who rented a farm across the stream from plaintiff's land and who testified that he had been familiar

On the question of opinion evidence as to rental value or use of property, see note in 44 L. R. A. (N. S.) 501.

On ownership of dam as giving exclusive right to waters impounded, see note in 3 B. R. C. 566.

with plaintiff's land since he was a boy, was qualified to testify as to the rental value of plaintiff's land.

5. SAME—CROSS-EXAMINATION—DISCRETION OF COURT—ABUSE.

There was no abuse of discretion on the part of the trial judge in limiting cross-examination of witness as to his interest where he testified that he had not employed counsel or made any claim against defendant for damages.

6. EVIDENCE—REMOTENESS—WATERS AND WATERCOURSES.

Where defendant put in its first dam in 1911, its objection that plaintiff's showing of conditions along the river in 1910 was too remote is without merit, since it was necessary to establish conditions before the dam was put in.

7. COMPROMISE AND SETTLEMENT — FRAUD — RELEASE — TENDER — RIGHT TO MAINTAIN ACTION.

If plaintiff executed a release of all damages, temporary or permanent, occasioned by the construction, maintenance, and operation of defendant's dam, upon the false representation of defendant's agent that it was paying him only for land washed away, and that it was not paying for crop damages, he was under no obligation to return the money so paid him before maintaining this action, which does not include damages for land washed away prior to the date of said release.

8. WATERS AND WATERCOURSES—DAMS—FLOODING LANDS—RIGHTS OF RIPARIAN OWNERS—REASONABLE USE—QUESTION FOR JURY.

While defendant has a right to maintain its dam and to a reasonable use of the water for power purposes, it has no absolute right to manipulate the waters measured alone by the demands of its customers, but its rights were qualified by the rights of other riparian owners, and whether its use was a reasonable one, under all the circumstances here disclosed, was a question for the jury.

9. SAME—DAMAGES—VALUE OF CROPS.

Where the testimony fairly tended to show that the work of producing and harvesting the crops had been performed, it cannot be said, as matter of law, that the expense thereof should be deducted from their market value in determining the amount of damages by reason of the yield being less than it would be if unaffected by the water.

10. SAME—EXCESSIVE VERDICT—NEW TRIAL.
    A verdict for $1,200 damages, which was much less than
    plaintiff claimed, *held*, not so manifestly against the clear
    weight of the evidence as to justify setting it aside as
    excessive.

Error to Arenac; Smith (Guy E.), J. Submitted
June 14, 1922. (Docket No. 10.) Decided October 2,
1922.

Case by Frank Merkel and another against the Con-
sumers Power Company for damages to plaintiff's land
caused by flooding. Judgment for plaintiffs. Defend-
ant brings error. Affirmed.

*Mechem, Onen & Mechem* (*B. J. Henderson*, of
counsel), for appellant.

*Coumans & Gaffney*, for appellees.

FELLOWS, C. J. Plaintiff is the owner of a farm of
180 acres near Oscoda on the bank of the Au Sable
river. It is his claim that 95 acres is valuable pro-
ductive farm land, a portion of which is bottom land
but a few feet above the natural level of the river. As
we understand, the balance of the farm is unpro-
ductive. Defendant has erected five dams on the
Au Sable above plaintiff's farm, the nearest one being
the Foote dam. It is the claim of the plaintiff that
defendant stores the water during certain hours of
the day at the Foote dam and that during the balance
of the day the water so stored is liberated, used for
power purposes, comes down the river in excessive and
unreasonable amounts flooding his lowland, making
some of it absolutely useless, damages crops on
other portions, and has washed away still other
portions. It is his claim that such daily fluctua-
tions in the stream amount to several feet, that
such use is unreasonable, in violation of his rights

and that he has suffered damage thereby for the recovery of which he brings this suit. Defendant does not deny that it stores water and uses it during the hours it has a demand for power; it claims such use is a reasonable use, and it denies that the fluctuations are as great as claimed by plaintiff or that it has caused plaintiff the damage he claims. Plaintiff had verdict and judgment in the court below and defendant brings the case here, assigning a large number of errors.

Plaintiff employed a surveyor to take the elevations of different portions of his farm and to prepare a map for use upon the trial. It was offered, received and used in the court below; a blueprint of it appears in the record but upon the trial many identification marks were made on it by witnesses and the original has therefore been filed and is before us. Defendant objected to receiving it in evidence. Having been made by a private surveyor it was necessary to properly identify it before it could be received. 1 Wigmore on Evidence, § 790 *et seq.* But we think the testimony of the surveyor made it admissible. The objection, and it seems to be the principal objection to it, is that it delineates the original channel of the river in 1843. This does not appeal to us as proper grounds for its exclusion for the purpose it was used. The surveyor found an old channel. He seems to have assumed or found that this was the channel of the stream when the government map was made in 1843. But the location of the old channel was not of importance in the case nor is it shown that the surveyor did not correctly delineate it. Upon the trial of the case the surveyor put on the map in ink the boundaries of plaintiff's farm. They do not run into the old channel. The map was used to show elevations at different points which were properly identified and various witnesses put on it marks show-

ing where holes were bored and otherwise used the map in connection with their testimony. We fail to perceive how defendant was in any way harmed by its use or by receiving it in evidence.

As to the lands plaintiff claims were rendered valueless, he offered evidence to show rental value. Objection was made to this line of testimony because the witnesses had not qualified themselves to speak on the subject, the principal objection urged being to the testimony of the witness Vaughn. This witness rented his mother's farm across the stream from the plaintiff's land. He testified that he had been familiar with plaintiff's land since he was a boy and that he knew what the rental value of land in that locality was. His testimony as to rental value was properly received. *Wallace* v. *Finch*, 24 Mich. 255; *Stone* v. *Covell*, 29 Mich. 359. In connection with the testimony of this witness defendant's counsel also assigns other error. It is counsel's claim that he was not permitted to cross-examine the witness as to his interest. The witness testified on cross-examination that he had not employed counsel or made any claim against the company for damages. We do not perceive that the trial judge abused his discretion in limiting further examination on the subject.

Plaintiff was permitted to show conditions along the river in 1910. It is objected that this was too remote. But defendant put in its first dam in 1911, and to establish conditions before the dam was put in it was necessary to go back to the year 1910.

On August 6, 1918, defendant paid plaintiff $200 and he executed a release of all damages temporary or permanent occasioned by the construction, maintenance and operation of the dams on the Au Sable - river. Upon the trial of the case plaintiff claimed that he executed the release in reliance upon the representations of the agents of the company that they were

paying him only for land then washed away, "broken down" as he expressed it, and that they were not paying for crop damages. He did not in this suit ask to recover for land washed away prior to August 6, 1918. Defendant's counsel pleaded the release and insists that plaintiff can not retain the money paid him, and maintain this action. He relies most strongly on *Union Pac. R. Co.* v. *Syas,* 158 C. C. A. 531, 246 Fed. 561. But we are persuaded that plaintiff's testimony brought the case within the holding of this court in *Porth* v. *Cadillac Motor Car Co.,* 198 Mich. 501. In that case plaintiff executed a complete release for all damages occasioned by a personal injury on the payment to him of $2,500. It was his claim that he executed the release believing that it was a receipt for $2,500 which he accepted in payment for loss of time, extra expenses, etc., for one year, leaving open the matter of further compensation. We there held (quoting from the syllabus) :

"If the contract under which the money was paid to plaintiff was limited to his loss of time, extra expenses and total incapacity for a year following the time it was entered into, with the matter of full compensation left open, owing to the uncertainty at that time of the permanency of the injuries and the extent of possible recovery, and plaintiff affirmed the contract, he was under no obligation to return the money paid in fraudulent settlement of it."

The trial judge quite properly denied defendant's motion for a directed verdict. This record clearly presents a jury question. While defendant's counsel does not go as far in his contention as did defendant's counsel in *Taylor* v. *Electric Co.,* 184 Mich. 578 (L. R. A. 1915E, 294), he does seem to contend that defendant may manipulate the waters of the Au Sable as the needs of its customers may require, and testimony was introduced tending to show that the Foote

dam was used as were other dams developing power in the State. In the *Taylor Case* we said:

"It is and always has been the law in this State that a dam owner cannot raise the water in his pond so as to flood and damage the lands of riparian owners upstream, or so manipulate the discharge of waters from his dam that they will flood and damage the lands of such owners downstream. All persons or corporations who own and maintain dams upon the streams of this State acquire only rights to a reasonable use of the water in such streams, subject to the rights of owners above and below them, and are held responsible for damages accruing to upper or lower riparian owners caused by the negligent operation of such dams."

This in no way overruled the case of *Dumont* v. *Kellogg*, 29 Mich. 420 (18 Am. Rep. 102), where this court held (quoting from the syllabus):

"Such proprietors have an equal right to the use of the water, and the right of each qualifies that of all the others; the question as between them is whether the use made of the water by one is reasonable and consistent with a correspondent use by the rest. A fair participation and a reasonable use by each is what the law seeks to protect, and an injury that is incidental to a reasonable enjoyment of the common right can demand no redress."

The trial judge quite carefully followed the *Taylor Case* and the charge there approved. He instructed the jury that defendant had the right to maintain its dams and was entitled to the reasonable use of the water of the river and could only be held liable in case the jury found its use was unreasonable. While he did not give all of defendant's requests upon this subject, he gave the substance of them in so far as they stated the applicable law. Under our former holdings the test of reasonableness could not be measured alone by the demand for power from defendant's customers; it did not have an absolute right to manipu-

late the waters of the river for power purposes alone, but its rights were qualified by the rights of other riparian owners.   Whether its use of the waters of the Au Sable was a reasonable one under the circumstances here disclosed was a question for the jury to decide, and such question was submitted in a fair and full charge.

Defendant's counsel preferred the following request:

"If in your deliberation you should reach the question of what, if any, damages the plaintiffs may be entitled to for injury, if any, to their growing crops, you should take into consideration whether the seasons have been favorable or unfavorable; the yield per acre, if such has been shown, upon similar land in the same vicinity; the market price in Iosco county; the expense in producing and harvesting the crops, and any other elements shown by the testimony as bearing upon the value of the crops claimed to have been destroyed, provided you are satisfied by a preponderance of the evidence in the case that such crops, if any, were injured as a proximate result of the unreasonable use of the waters of the Au Sable river by the defendant."

The trial judge instructed the jury as follows:

"Another element of damages the plaintiff claims is the loss of certain crops which he had planted and which he otherwise would have cultivated.   In this connection you will also consider the testimony and from it determine the plaintiff's loss with respect to his crop damage.   You will in this connection consider the testimony that has been given, and test this testimony by your own good judgment as men of affairs, and consider all of the hazards in connection with this cultivation, the sale of farm crops, and determine what in your best judgment constitutes the actual loss to the plaintiff by reason of his inability to harvest certain crops which he claims he planted in this ground and lost by reason of the acts of the defendant."

It was urged upon the argument and in the briefs that this instruction and no other covered the quoted

request, and the point is made that nowhere was the jury told that they should deduct from the market value of the crops the expense of producing and harvesting them. But we think the testimony fairly tends to establish that the work of producing and harvesting the crops had been performed. There were three elements of plaintiff's claim:

(1) Land washed away.
(2) Land rendered absolutely unproductive and not used by plaintiff.
(3) Damage to growing crops by reason of the fluctuation of the water rendering the yield per acre less than it otherwise would have been.

Upon the third element of the case there was testimony that upon the crops being harvested it developed that the yield was less than upon similar lands on other and unaffected portions of the farm. We think under these circumstances it could not be said as matter of law that the expense of producing and harvesting the crops should be deducted, as there was evidence from which the jury would be justified in finding that it had been incurred.

Defendant by motion for a new trial preserved the question of the excessiveness of the verdict. The jury assessed plaintiff's damages at $1,200, much less than he claimed in his bill of particulars. The trial judge declined to disturb the verdict and we are not persuaded from the record that he was in error. It is true that a portion of the land involved was separated from the balance of the farm by the so-called D. & M. cut which had been put in with defendant's consent, and that such portion was therefore less adaptable for use and less valuable and it is possibly true that the narrowing of the stream by this cut had some effect on plaintiff's land. But these questions were primarily for the jury. The period covered was the war period when abnormally high prices ob-

tained and when rental values of farm land and values of farm produce were higher than those obtaining today.    The amount of the verdict is not so manifestly against the clear weight of the evidence as to justify us in setting it aside as excessive.

The trial lasted several days.    A record of 527 pages and 196 pages of brief have been carefully considered.    There are 96 assignments of error.    We can not take up and discuss each one.    All have been considered.    We find no prejudicial error upon this record.

The judgment will be affirmed.

WIEST, McDONALD, CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.